UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

James H. Sarkees and Deborah J. Sarkees,

                            Plaintiffs,

    v.

E. I. DuPont de Nemours and
  Company et al.,

                            Defendants.

**Decision and Order**

17-CV-651V

---

## I.    INTRODUCTION AND BACKGROUND

James and Deborah Sarkees believe that they suffered various damages, including loss of consortium, because defendants E. I. DuPont de Nemours and Company and First Chemical Corporation did not properly warn James that his workplace exposure to ortho-toluidine would lead to bladder cancer. James allegedly was exposed to ortho-toluidine when he worked at the Goodyear Tire & Rubber Company in Niagara Falls, New York in 1974. Plaintiffs commenced this case by filing their complaint on July 14, 2017. (Dkt. No. 1.) The complaint contains claims of negligence and strict product liability.

The parties have come before the Court now to resolve three separate discovery-related motions. Plaintiffs seek a protective order blocking the deposition of Deborah Sarkees. (Dkt. No. 29.) Defendants want to compel some additional discovery from plaintiffs' two expert witnesses. (Dkt. No. 36.) Defendants also have cross-moved for an order compelling Deborah Sarkees's deposition. (Dkt. No. 41.) For the sake of brevity, the Court will say more about each motion as needed below and otherwise presumes familiarity with the docket. The Court has deemed all three motions submitted on papers under Rule 78(b).

## II. DISCUSSION

### A. *General principles for motions for protective orders and motions to compel*

"A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending . . . . The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ." Fed. R. Civ. P. 26(c). "The party seeking a protective order has the burden of showing that good cause exists for issuance of that order." *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 142 (2d Cir. 2004) (internal quotation marks and citation omitted).

Similar principles govern motions to compel. "Motions to compel and motions to quash a subpoena are both entrusted to the sound discretion of the district court. This principle is in keeping with the traditional rule that a trial court enjoys wide discretion in its handling of pre-trial discovery, and its rulings with regard to discovery are reversed only upon a clear showing of an abuse of discretion. A district court abuses its discretion when (1) its decision rests on an error of law or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *Am. Savings Bank, FSB v. UBS PaineWebber, Inc. (In re Fitch, Inc.)*, 330 F.3d 104, 108 (2d Cir. 2003) (internal quotation and editorial marks and citations omitted). "The burden of demonstrating relevance is on the party seeking discovery. Once relevance has been shown, it is up to the responding party to justify curtailing discovery. The objecting party must show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each request is not relevant or how each question is overly broad, burdensome or oppressive. Even when the requested information sought is relevant, the court must limit the frequency or extent of discovery where it is unreasonably cumulative or duplicative or when the burden or expense of the proposed discovery outweighs its likely benefit. Courts have significant flexibility and discretion to assess the

circumstances of the case and limit discovery accordingly to ensure that the scope and duration of discovery is reasonably proportional to the value of the requested information, the needs of the case, and the parties' resources." *Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 557, 561–62 (S.D.N.Y. 2013) (internal quotation marks and citations omitted).

Proportionality has assumed greater importance in discovery disputes since the recent amendments to Rule 26 of the Federal Rules of Civil Procedure. Rule 26(b)(1) now sets forth that discovery must be "relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." "Under the amended Rule, relevance is still to be construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on any party's claim or defense. However, the amended Rule is intended to encourage judges to be more aggressive in identifying and discouraging discovery overuse by emphasizing the need to analyze proportionality before ordering production of relevant information." *Walker v. H & M Henner & Mauritz, L.P.*, No. 16 CIV. 3818 (JLC), 2016 WL 4742334, at *2 (S.D.N.Y. Sept. 12, 2016) (internal quotation and editorial marks and citations omitted).

Orders addressing either motions for protective orders or motions to compel are reviewed only for abuse of discretion. *See Cruden v. Bank of New York*, 957 F.2d 961, 972 (2d Cir. 1992) ("A trial court enjoys wide discretion in its handling of pre-trial discovery, and its rulings with regard to discovery are reversed only upon a clear showing of an abuse of discretion.") (citations omitted).

### B. *Deposition of plaintiff Deborah Sarkees*

Again, plaintiffs seek a protective order blocking the deposition of plaintiff Deborah Sarkees, James's wife. According to plaintiffs, Deborah did not meet James until 1985 and did not marry him until 1986, meaning "that she has no knowledge of her husband's work at Goodyear in 1974." (Dkt. No. 29-1 at 5.) Plaintiffs express frustration with repeated failures to have any deposition of Deborah scheduled. Plaintiffs also have included this comment in their motion papers:

> It is respectfully submitted that these defendants have no real interest in hearing what Deborah Sarkees has to say about her damages. Rather, this entire dispute was a retaliatory game played by defense attorney David Kloss in order to obtain a second deposition of the plaintiffs' expert in another case. Yet, even when presented with an agreement to provide that very deposition, Mr. Kloss decided to up the ante by refusing the pay the costs that would be incurred by the expert in preparing for the deposition.

(Dkt. No. 29-9 at 4.) After addressing issues related to scheduling and availability, defendants address the substantive need for Deborah's testimony as follows:

> Plaintiffs' Counsel argues that a deposition of Mrs. Sarkees is not proportional or necessary to the case. There are several circumstances that necessitate the testimony of Plaintiff Mrs. Sarkees. First, Mrs. Sarkees is a named party to this lawsuit. She, together with her husband, is seeking compensatory, special, and punitive damages in excess of $150,000.00. She has interposed her own loss of consortium claim against the Defendants. Mrs. Sarkees is the key witness regarding her claim—the defendants have no other access to the information relevant to her claim. Defendants should be permitted to elicit information from her as to the extent of such alleged loss and the nature of services that she has had to render, as such matters relate directly to her cause of action.
>
> Second, Mrs. Sarkees met Mr. Sarkees while both were working for the Frontier Chemical Plant. This facility was subsequently classified as a Superfund site due to the toxic agents handled on the property. Mrs. Sarkees worked in the office at the Frontier Chemical Plant for several years. Thus, she likely possesses more information regarding the plant and its potential exposures than Mr. Sarkees may have had.
>
> Third, Mrs. Sarkees was also involved in and has knowledge of the commercial trucking business that Mr. Sarkees operated. Truck driving, an

> occupation that Mr. Sarkees has held for over 30 years, caused Mr. Sarkees to be exposed to diesel exhaust fumes, which are considered to be known human carcinogens by the International Agency for the Research on Cancer. While the parties disagree as to full extent of the exposure, Plaintiffs' specific causation expert, Dr. L. Christine Oliver, concedes that these toxic exposures occurred in her expert report.
>
> Lastly, Mr. and Mrs. Sarkees have been married for over 30 years, and as such she can testify to the alleged lifestyle changes of Mr. Sarkees as a consequence of his diagnosis and subsequent treatment. Accordingly, Mrs. Sarkees possesses unique knowledge of facts pertinent to this case.

(Dkt. No. 41-1 at 10–11.)

Defendants have the better argument here. Based on the correspondence in the docket, neither side seems to be philosophically opposed to having this deposition occur. The parties mostly became frustrated about scheduling. Even if plaintiffs objected to the deposition on substance, the objections would not be sufficient. Deborah Sarkees probably does not have much to say about the substance of the negligence and strict liability claims. *Cf. Franco v. Yale Univ.*, 80 Fed. App'x 707, 710 (2d Cir. 2003) (summary order) (affirming grant of a protective order against the deposition of an employee who "was not employed by Yale when all of the operative events occurred, and had submitted an affidavit attesting to his lack of knowledge"). Still, Deborah might have a lot to say about the daily impact of any alleged injuries on her husband's life. Deborah also can testify about her claim for loss of consortium. The potential for uncovering relevant information is enough at this stage of the litigation. *Cf. Brown v. Astoria Fed. Sav. & Loan Ass'n*, 444 Fed. App'x 504, 505 (2d Cir. 2011) (summary order) (affirming the denial of a protective order where the district court "discredited these allegations of abuse of process and credited Astoria's representations that the opportunity to examine Brown in person to assess his demeanor and credibility was necessary to prepare its defense").

While the Court will allow Deborah's deposition to occur, it is concerned about the inability of experienced counsel to settle on mutually agreeable circumstances for the deposition. Accordingly, and barring extraordinary circumstances, the Court orders that any deposition of Deborah must conclude on or before May 31, 2019. Failure to conclude the deposition by that date will lead to waiver of the deposition and sanctions as needed.

### C. Dr. Finkel's prior reports

Next, defendants seek further production from one of plaintiffs' experts, Dr. Adam Finkel. Dr. Finkel is a Clinical Professor of Environmental Health Sciences at the University of Michigan School of Public Health. Dr. Finkel has provided defendants with a report that—and the Court apologizes in advance for oversimplification in the name of brevity—focuses on a "what did they know and when did they know it" theme with respect to the cancer risks for ortho-toluidine. (*See generally* Dkt. No. 36-3.) That is, the report reviews research conducted about cancer risks for ortho-toluidine; how much of this research defendants would have known when supplying the chemical to James Sarkees's workplace; and what warnings defendants could have provided but did not. Through discovery conducted so far, defendants have identified three other cases in which Dr. Finkel generated reports concerning risks of exposure from beryllium and 1-bromopropane. Defendants suspect similarities between the three prior reports and the report that Dr. Finkel created for this case:

> Dr. Finkel's opinions in this case (Sarkees) mirror the issues involved in the three cases referenced above. He opines that OT causes bladder cancer. Ex. A ¶ 12. He repeatedly opines that the defendants' warnings were inadequate, particularly about OT's alleged ability to cause bladder cancer. *Id.* ¶¶ 45-101. He opines on industrial hygiene at the Goodyear plant where Mr. Sarkees worked, including lack of urine monitoring and inadequacy of air monitoring (¶¶ 31, 34, 43), DuPont's handling of OT and its industrial hygiene measures at its own plant (¶ 38), DuPont's knowledge about personal protective equipment (¶¶ 34, 39), and DuPont's alleged failure to test OT (¶ 37).

6

> Despite multiple requests for production of Dr. Finkel's reports in the three prior chemical exposure cases, plaintiffs and Dr. Finkel have refused to produce them. Wishnoff Aff. ¶¶ 4, 7-12.

(Dkt. No. 36-1 at 7–8.) After reviewing Rule 26 disclosures, deposing Dr. Finkel, and considering the report prepared for this case, defendants have not claimed that Dr. Finkel used any prior reports as a basis for any opinion or analysis in this case. At his deposition, Dr. Finkel never stated or suggested that any prior reports formed the basis for the report in this case. (*See generally* Dkt. No. 36-6.) Nonetheless, according to defendants, "[t]he requested prior reports of Dr. Finkel, like this case, involved chemical exposures, and causation and/or warnings issues, and will show whether Dr. Finkel has inconsistently analyzed scientific issues regarding chemical exposures and warnings in different actions. The discovery will bear upon Dr. Finkel's credibility, as well as the reliability of his methodology under Fed. R. Evid. 702 and *Daubert*." (Dkt. No. 36-1 at 10.) Plaintiffs question how defendants can assess Dr. Finkel's consistency across cases with different chemicals and different exposure risks:

> In order to bring this historical evidence before the jury, the Plaintiffs have engaged the services of Adam M. Finkel, who has a doctoral degree in environmental health sciences from the Harvard School of Public Health, a certification in the field of industrial hygiene, and who was the director of the office of health standards for the U.S. Department of Labor's Occupational Safety and Health Administration from 1995 to 2000. At trial, Dr. Finkel will report on the historical information that was available on ortho-toluidine and will render opinions on the lack of or inadequacy of the defendants' warnings.
>
> It is important to note that Dr. Finkel will not offer opinions regarding general or specific causation, nor will he evaluate chemical exposures. Rather, his role at trial will be to report to the jury on the history of the development of scientific knowledge on the potential hazards to human health from exposure to ortho-toluidine, based on a comprehensive review of the scientific and medical literature and the discovery record in this case. Based on his expertise in the field of industrial hygiene, Dr. Finkel will evaluate whether the defendants' warnings adequately reflected the information which the defendants knew or should have known. *See* Defs. Ex. D, 12:5-12.

> Due to the unique nature of this assignment, the only other expert reports of Dr. Finkel that could be relevant to the opinions that he intends to render in this matter would be his reports from other ortho-toluidine cases. Fortunately for these defendants, all other ortho-toluidine cases in which Dr. Finkel has appeared have been filed in the Western District of New York against these same defendants who are represented by the same defense counsel who appear in the instant matter. Defense counsel do not deny that they possess Dr. Finkel's prior ortho-toluidine reports.

(Dkt. No. 45-1 at 3–4.)

With one limited exception, plaintiffs have the better argument here. If for any reason Dr. Finkel used prior reports as the basis for any analysis or opinion in the report generated for this case then he will have to disclose those prior reports. Any prior reports otherwise are not relevant. Dr. Finkel's report in this case contains extensive citation to research literature; that literature can be produced if defendants are unable to obtain it. The report describes how Dr. Finkel derived his opinions about warnings from the existing research literature. If Dr. Finkel's opinions do not line up with the existing research literature then defendants can impeach him accordingly. Defendants already have reports from Dr. Finkel for prior cases in this District involving ortho-toluidine. Defendants also know the prior cases in which Dr. Finkel provided court testimony; the dockets and trial transcripts for those cases are public record, as far as the Court knows.

If all of the above available information fails to impeach Dr. Finkel then three prior reports about two different chemicals will not do so, either. Defendants' case law does not persuade the Court otherwise. *Simuro v. Shedd*, No. 2:13-CV-30, 2014 WL 5776149 (D. Vt. Nov. 6, 2014), required disclosure of prior expert reports because they addressed the same issue as in the case at hand: "the adequacy of interviews in child sexual abuse cases." *Id.* at *4. *Jenks v. New Hampshire Motor Speedway, Inc.*, No. 09-CV-205-JD, 2011 WL 4625705, (D.N.H. Oct. 3, 2011), required disclosure of prior expert reports about the same issue of product warnings and a search of an expert's database for opinions about the same product. *Id.* at *4–5. *Expeditors Int'l of Washington, Inc.*

8

*v. Vastera, Inc.*, No. 04 C 0321, 2004 WL 406999, at *2 (N.D. Ill. Feb. 26, 2004), required disclosure of "expert reports in trade secret[s] during the past ten years and patent matters during the past five years," where 1) the case at hand also was a trade secret misappropriation case; and 2) the expert had not produced anything in the face of a subpoena and had not produced anything at all beyond the minimum listings required by Rule 26(a)(2)(B). These cases are distinguishable from the situation here, where Dr. Finkel has disclosed a considerable amount of information about the subject at hand and where defendants seek additional information about different subjects.

### D. Dr. Oliver's assumptions from plaintiff's counsel

Finally, defendants seek additional production from another of plaintiffs' experts, L. Christine Oliver, MD, MS. Dr. Oliver is a practicing physician who is board-certified in preventive occupational medicine and in internal medicine. (Dkt. No. 45-6 at 3.) Dr. Oliver has provided an expert report and a rebuttal report. (Dkt. Nos. 45-6, 45-7.) Dr. Oliver has formed opinions—and again the Court apologizes in advance for oversimplification in the name of brevity—that James Sarkees has bladder cancer caused by exposure to ortho-toluidine at defendants' facilities. In the reports, Dr. Oliver lists all of the information that formed the basis of her opinions: records from plaintiffs' counsel including medical records and work history records; her own inspection of the Goodyear facility in 1979; direct communication with James Sarkees including his family and work history; and 76 citations to articles from the research literature. Dr. Oliver did not state that she relied on any "assumptions that the party's attorney provided" as described in Rule 26(b)(4)(C)(iii). Dr. Oliver further submitted to a deposition on November 29, 2018 about her reports and the opinions in them. Defendants have not identified any deficiencies in Dr. Oliver's reports that would run afoul of Rule 26(a)(2)(b). Nonetheless, defendants seek to compel Dr. Oliver to answer the following question: "Did Mr. Wodka [plaintiffs' counsel] provide you with any assumptions for

9

which you relied upon [sic] in forming your opinion?" Plaintiffs' counsel instructed Dr. Oliver not to answer the question at her deposition. Defendants have not pointed to anything in the record that hints at attorney-driven assumptions lurking in the background. Defendants' request instead is more general:

> The request of Dr. Oliver during her deposition to identify any assumptions that plaintiffs' counsel provided and upon which she relied is squarely within the specific category of attorney-expert communications that are discoverable pursuant to Rule 26(b)(4)(C)(iii). The need to identify and elucidate any assumptions for which Dr. Oliver relied is necessary in order to understand her foundation and reasoning in forming the opinion that OT was the cause of the Plaintiff's bladder cancer and not the other agents to which plaintiff was exposed. The discovery will also bear upon Dr. Oliver's credibility, as well as the reliability of her methodology pursuant to Fed. R. Evid. 702 and *Daubert*. Accordingly, defendants submit that the assumptions which Dr. Oliver were provided and upon which she relied are discoverable.

(Dkt. No. 36-1 at 12–13.) Plaintiffs respond that, as a matter of general principle, they do not object to the application of Rule 26(b)(4)(C)(iii) here. Plaintiffs instead claim that the original question "was not connected to any particular opinion rendered by Dr. Oliver" and thus was so broad as to risk invading attorney work product. (Dkt. No. 45-1 at 14.) Plaintiffs then point out that Dr. Oliver's deposition proceeded without any instructions not to answer when defendants asked her about specific bases for specific opinions. (*Id.*) Plaintiffs conclude that

> To require a physician in the midst of an oral deposition to cull through 20 opinions in her mind and separate counsel's work product from the assumptions that she relied upon is not only an impossible task, but also one fraught with the probability that counsel's mental impressions, conclusions, opinions or legal theories would be divulged.
>
> Accordingly, counsel's instruction to Dr. Oliver not to answer the question was justified. The discovery should have been pursued in the form of a request for production of documents or an interrogatory. Accordingly, the motion to compel should be denied.

(*Id.* at 18.)

Rule 26(b)(4)(C)(iii) protects "communications between the party's attorney and any witness required to provide a report under Rule 26(a)(2)(B), regardless of the form of the communications, except to the extent that the communications identify assumptions that the party's attorney provided and that the expert relied on in forming the opinions to be expressed." "[U]nder Rule 26(b)(4)(C)(iii) discovery regarding attorney-expert communications is permitted to identify any assumptions that counsel provided to the expert and that the expert relied upon in forming the opinions to be expressed. For example, the party's attorney may tell the expert to assume the truth of certain testimony or evidence, or the correctness of another expert's conclusions. This exception is limited to those assumptions that the expert actually did rely on in forming the opinions to be expressed. More general attorney-expert discussions about hypotheticals, or exploring possibilities based on hypothetical facts, are outside this exception." Fed. R. Civ. P. 26(b)(4)(C)(iii) advisory committee's note to 2010 amendment. An example of the hypothetical described in the advisory committee note is a letter that counsel sends to an expert identifying certain assumptions as a starting point for analysis, and then having those assumptions incorporated into an expert report without independent review. *Cf. Spirit of Aloha Temple v. Cty. of Maui*, No. CV 14-00535 SOM-RLP, 2017 WL 1848468, at *3 (D. Haw. May 8, 2017) ("Although it is a communication between counsel and an expert, the letter identifies assumptions that Plaintiffs' counsel provided to Mr. Bradbury and that Mr. Bradbury relied on in forming his opinion. Specifically, the letter sets forth three issues to be addressed in Mr. Bradbury's report. The statement of these issues includes certain assumptions regarding activities within a botanical garden that are later reflected in Mr. Bradbury's report.") (citation omitted). Here, plaintiffs already have produced all documents that Dr. Oliver used to prepare her reports. (Dkt. No. 36-7 at 4.) Dr. Oliver already identified all the materials that she used to form her opinions. *Cf. Izzo v. Wal-Mart Stores, Inc.*, No. 215CV01142JADNJK, 2016 WL

11

593532, at *4 (D. Nev. Feb. 11, 2016) ("Dr. Woolson makes clear that his analysis is based solely on his review of Plaintiff's medical records, and there is no indication that he relied upon factual information provided by Defendant's counsel. Indeed, the report is essentially a recitation of Plaintiff's medical records and summarization of Plaintiff's medical history.") Nothing produced in discovery so far suggests that plaintiffs' counsel instructed Dr. Oliver to assume the truth of any of plaintiffs' contentions or to guide her analysis down any particular path. *Cf. In re W. States Wholesale Nat. Gas Antitrust Litig.*, No. 203CV01431RCJPAL, 2017 WL 2991347, at *9 (D. Nev. July 12, 2017) ("[N]othing in the record supports a finding that Mr. Donkin relied on the mental impressions, conclusions, and theories of counsel or on assumptions provided by counsel in reaching his opinions."); *United States Commodity Futures Trading Comm'n v. Newell*, 301 F.R.D. 348, 353 (N.D. Ill. 2014) (conditionally requiring production of email messages if those messages contained instructions to make assumptions). Nothing so far suggests that plaintiffs' counsel drafted or significantly edited any part of Dr. Oliver's reports. *Cf. United States ex rel. Wall v. Vista Hospice Care*, 319 F.R.D. 498, 511 (N.D. Tex. 2016) (compelling production of any portions of a draft expert report that were written by counsel or whose facts were supplied by counsel); *Medicines Co. v. Mylan Inc.*, No. 11-CV-1285, 2013 WL 2926944, at *4 (N.D. Ill. June 13, 2013) (denying a motion to compel where, *inter alia*, counsel "did not write any portion of the document that the counsel gave to the expert").

Under these circumstances, no further discovery from Dr. Oliver will be necessary.

III. **CONCLUSION**

For all of the above reasons, the Court grants defendants' motion (Dkt. No. 41) in part to require a deposition of Deborah Sarkees to occur on or before May 31, 2019. The Court grants defendants' motion (Dkt. No. 36) in part to require disclosure of Dr. Finkel's prior reports about beryllium and 1-bromopropane, if and only if Dr. Finkel used any part of those reports as the basis

12

for any analysis or opinion in the report generated for this case. The Court denies the parties' motions (Dkt. Nos. 29, 36, 41) in all other respects. No costs are awarded to any party.

The Court had suspended all remaining pretrial deadlines until it resolved the pending motions. (Dkt. No. 38.) On or before April 12, 2019, the parties will meet and confer and then file a joint letter proposing new pretrial deadlines.

SO ORDERED.

                                                  __/s Hugh B. Scott_____
                                                  Hon. Hugh B. Scott
                                                  United States Magistrate Judge

DATED: March 27, 2019